**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN P. LOOS, individually and on behalf of all others similarly situated, *Plaintiffs-Appellants*, <br><br> v. <br><br> IMMERSION CORPORATION; VICTOR A. VIEGAS; RALPH EDWARD CLENTON RICHARDSON; STEPHEN AMBLER; RICHARD VOGEL, *Defendants-Appellees*. | No. 12-15100 <br><br> D.C. No. 3:09-cv-04073-MMC <br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, Senior District Judge, Presiding

Argued and Submitted
February 12, 2014—San Francisco, California

Filed August 7, 2014
Amended September 11, 2014

Before: Richard C. Tallman and Johnnie B. Rawlinson,
Circuit Judges, and Thomas O. Rice, District
Judge.[*]

---

[*] The Honorable Thomas O. Rice, United States District Judge for the Eastern District of Washington, sitting by designation.

Order;
Opinion by Judge Rice

## SUMMARY[**]

### Securities Fraud

The panel filed (1) an order amending opinion and (2) an amended opinion in which it affirmed the district court's dismissal for failure to state a claim of a securities fraud class action alleging violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and Rule 10b-5.

Agreeing with the Eleventh Circuit, the panel held that the announcement of an investigation, standing alone, and without any disclosure of actual wrongdoing, is insufficient to establish loss causation. It held that the plaintiff could not establish loss causation on the facts alleged in the amended complaint because he had not attempted to correlate his losses to anything other than the announcement of an internal investigation.

### COUNSEL

David A.P. Brower and Richard H. Weiss (argued), Brower Piven, New York, New York; and Sanford Svetcov, Susan K. Alezander, and Willow E. Radcliffe, Robbins Geller Rudman & Dowd, LLP, San Francisco, California, for Plaintiffs-Appellants.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Susan S. Muck, Jennifer C. Bretan (argued), and Marie C. Bafus, Fenwick & West, LLP, San Francisco, California; and Felix S. Lee, Fenwick & West, LLP, Mountain View, California, for Defendants-Appellees.

## ORDER

The Opinion filed on August 7, 2014, is hereby amended as follows: At the end of the final sentence of the first full paragraph on page 18 (now page 19), the following footnote 3 is appended:

> We do not mean to suggest that the announcement of an investigation can *never* form the basis of a viable loss causation theory. Like the Eleventh Circuit, we merely hold that the announcement of an investigation, "standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure." *Meyer*, 710 F.3d at 1201 n.13 (internal quotation marks omitted). To the extent an announcement contains an express disclosure of actual wrongdoing, the announcement alone might suffice.

An amended opinion is filed concurrently with this Order. No further petitions for panel rehearing or rehearing en banc will be entertained.

**OPINION**

RICE, District Judge:

Plaintiff John Loos appeals the district court's dismissal of his securities fraud class action for failure to state a claim. Plaintiff argues that the district court erred by analyzing his allegations of scienter in isolation rather than "collectively" as mandated by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). Plaintiff further challenges the district court's conclusion that he failed to establish loss causation by alleging a precipitous decline in Immersion Corp.'s stock price on the heels of a July 1, 2009 press release announcing an internal investigation into the company's revenue accounting practices.

We hold that the announcement of an investigation, standing alone, is insufficient to establish loss causation. We further conclude that Plaintiff cannot establish loss causation on the facts alleged in the amended complaint because he has not attempted to correlate his losses to anything other than the announcement of an internal investigation. We therefore affirm the district court on this loss causation issue. We do not reach Plaintiff's arguments regarding scienter.

**I.**

Immersion Corporation ("Immersion") is a publicly-traded company listed on the NASDAQ stock exchange. Immersion develops and licenses "haptics" technology, which, in broad strokes, allows high-tech electronic devices to produce tactile feedback to the user. One example of a haptics-enabled device is a smartphone that produces a "pulse" or a "pushback" sensation when the user clicks a

button on the screen. At the times relevant to this appeal, Immersion focused primarily on developing haptics technology for use in handheld electronics and medical training devices.

Plaintiff John Loos ("Plaintiff") and several other purchasers of Immersion stock filed class actions against Immersion in the Northern District of California in late 2009. The district court consolidated the cases and appointed Plaintiff to represent the putative class. Plaintiff subsequently filed a consolidated complaint on behalf of himself and a class of shareholders who purchased Immersion stock between May 3, 2007, and July 1, 2009 (the "class period"). This complaint alleged violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities and Exchange Commission's implementing regulations. Named as defendants were Immersion and five of its top executives, Defendants Victor Viegas, Clent Richardson, Stephen Ambler, Richard Vogel and Daniel Chavez.

Defendants moved to dismiss the complaint on June 15, 2010, for failure to state a claim. The district court granted the motion on March 11, 2011, ruling, *inter alia*, that Plaintiff failed to adequately plead the scienter and loss causation elements of his claims. Finding that these deficiencies could potentially be cured, the district court granted Plaintiff leave to amend.

Plaintiff filed an amended complaint asserting the same causes of action on April 29, 2011.[1] Defendants filed a

---

[1] Daniel Chavez was not named as a defendant in Plaintiff's amended complaint and is not a party to this appeal.

second motion to dismiss on July 1, 2011. The district court granted the motion on December 16, 2011, concluding, once again, that Plaintiff failed to plausibly allege the scienter and loss causation elements of his claims. Because Plaintiff had failed to correct the deficiencies identified in its prior dismissal order, the district court dismissed the amended complaint with prejudice.

Plaintiff now appeals.

## II.

From the time it went public in 1999 until the fourth quarter of 2006 ("4Q06"[2]), Immersion did not turn a profit. Although the company appeared to be poised for growth, it struggled to control its operating costs. During this period, Immersion experienced significant pressure from its investors to "ramp up" to sustained profitability.

Immersion's fortunes appeared to change in 1Q07, when the company settled a patent infringement claim against a large electronics manufacturer for $150 million. With the receipt of these funds, Immersion was able to report its first profitable quarter as a publicly traded company. Although the company was pleased with the impact of the settlement on its balance sheet, it recognized that investors would not be content with a one-time influx of capital. Thus, Immersion announced during a conference call about 1Q07 earnings that it would invest the settlement funds in new growth initiatives that would translate to profitable quarters and sustained revenue growth for the remainder of 2007.

---

[2] For convenience, we will use this abbreviation format for all financial quarters throughout our opinion.

Immersion disclosed its 2Q07 earnings on August 2, 2007. In a press release, the company's CEO, Defendant Victor Viegas, announced that Immersion had achieved "back-to-back profitable quarters" as a result of strong sales in its Medical Division. On a subsequent conference call with investors, Viegas reported that Medical Division revenues had grown 19% over the second quarter of 2006 and were poised for further growth. When asked about Immersion's prospects for growth internationally, Viegas stated that the company anticipated considerable success marketing its medical products in China.

Immersion released its 3Q07 financial results on November 1, 2007. In a press release announcing the results, Immersion proclaimed that it had achieved "three consecutive profitable quarters" and had experienced "very strong year-to-date revenue growth." On a subsequent earnings call, Viegas informed investors that the company's Medical Division revenues had grown 39% over the third quarter of 2006.

Immersion reported its 4Q07 earnings on February 28, 2008. In yet another press release, the company declared that it had achieved "profitability in each of the four quarters" in 2007. During a conference call with investors, Viegas boasted that the company's 4Q07 and fiscal year 2007 results were "the best in Immersion's history." Immersion's CFO, Defendant Stephen Ambler, reiterated that these numbers were "record highs."

Unfortunately, Immersion's momentum stalled in early 2008. On May 1, 2008, Immersion announced a net loss of $2.6 million for 1Q08. Despite this disappointing news, Ambler emphasized to investors that Medical Division

revenues had increased by 13% over 1Q07 and would continue to drive growth. When questioned about the company's progress internationally, Viegas forecast that Immersion would see a "dramatic increase" in Medical Division revenues over the next three quarters.

On July 31, 2008, Immersion announced a net loss of $3.1 million for 2Q08. In an effort to put a positive spin on this disappointing news, Immersion highlighted in a press release that its total revenue had grown by 8% over 2Q07 and by 16% over the first six months of 2007. Defendant Clent Richardson, who by that time had succeeded Viegas as CEO, further emphasized that Immersion was beginning to see significant returns on its investments internationally: "We are already seeing positive and measurable results from our investments. Second quarter of international revenues reached $4.5 million, almost 50% of total [company] revenue, and an increase of 25% compared to the year-ago quarter."

Immersion released its 3Q08 results on October 30, 2008. After adjusting for a one-time charge related to the settlement of a lawsuit, the company reported a net loss of $4.3 million. Once again, Immersion attempted to focus investors' attention on revenue growth. In a press release, the company announced that it had exceeded $10 million in quarterly revenue for the first time in its history. During an earnings call, Ambler explained that $5.6 million of this sum had come from international medical sales, a figure that represented a 112% year-over-year increase. Richardson further reported that "[o]verseas revenue for medical grew more than 3 times over [3Q07]."

Immersion announced its 4Q08 earnings on March 2, 2009. Adjusting for a one-time charge related to the

divestiture of a business segment, the company reported a net loss of $7.1 million. In contrast to the revenue growth reported for the prior three quarters, Immersion's 4Q08 revenues declined 9% over the prior year period. Despite these poor results, Immersion highlighted to investors that it "continued to see strong growth in international sales with [the] medical line of business. Medical international revenues grew 135% over the year-ago period, and also grew 24% sequentially."

Results for 1Q09 were announced on May 4, 2009. Immersion reported a net loss of $7.5 million and only a 1% increase in revenues over the prior year period. The company also announced a 16% decrease in medical revenues over the prior year period. Immersion conceded that the Medical Division "ha[d] not met revenue expectations."

Shortly thereafter, on July 1, 2009, Immersion disclosed a potential problem with its previously reported revenues. In a press release issued before the stock market opened, the company revealed that it had launched an internal investigation into revenue recognition practices in its Medical Division:

> [T]he Audit Committee of the Board of Directors of Immersion Corporation ("Immersion") is conducting an internal investigation into certain previous revenue transactions in its Medical line of business. The investigation is being conducted with the assistance of outside counsel. The Audit Committee has not yet determined the impact, if any, to Immersion's historical financial statements. As a result of this investigation,

> Immersion may discover information that could raise issues with respect to its previously-reported financial information, which could be material. Immersion will not be able to evaluate the full impact of the aforementioned matters until the Audit Committee completes its review and further analysis is completed.

Immersion's stock price dropped over 23% to close at $3.80 per share on this news.

On August 10, 2009, Immersion advised investors that its prior financial statements "should no longer be relied upon" due to irregularities with "certain revenue transactions" in the Medical Division. The company further disclosed that, as a result of these irregularities, it would restate its financials for fiscal year 2008 at a later date.

Immersion disclosed the findings of its internal investigation on February 8, 2010. In an amended Form 10-K/A filed with the Securities and Exchange Commission ("SEC"), the company admitted to having made "errors in . . . the recording of revenue transactions from [its] Medical line of business." More specifically, Immersion revealed that it had recognized sales revenue prematurely, in violation of generally accepted accounting principles ("GAAP") and its own internal policies, in three main areas: (1) on orders shipped to a Chinese customer pursuant to a "side agreement" that granted the customer unauthorized shipping and payment terms; (2) on orders of products that were either "not available" or "not fully developed" when sold; and (3) on orders that were not promptly delivered, that included non-standard terms, or that lacked probable collectability. As a

result of these errors, Immersion restated its earnings for 2006, 2007, 2008 and 1Q09. The most significant impact of the restatement was on fiscal year 2008, in which Immersion reversed $623,000 in medical sales revenue and deferred another $3 million to later periods.

## III.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review the dismissal of a securities fraud claim under Federal Rule of Civil Procedure 12(b)(6) de novo. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009). The scope of our review is "generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of which we may take judicial notice." *Id.* Dismissal without leave to amend is reviewed for abuse of discretion. *Id.*

## IV.

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements § 10(b), prohibits the following practices "in connection with the purchase or sale of any security":

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5.

Violations of § 10(b) and Rule 10b-5 give rise to a cause of action in favor of any purchaser or seller of securities who has been injured by a company's fraudulent practices. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007). There are six elements to a securities fraud claim under § 10(b) and Rule 10b-5: (1) a material misrepresentation or omission; (2) scienter (*i.e.*, a wrongful state of mind); (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation (often established in "fraud-on-the-market" cases via a presumption that the price of publicly-traded securities reflects all information in the public domain); (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

At issue here is the element of loss causation. Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor. *Id.* at 342. Ultimately, a securities fraud plaintiff must prove that the defendant's misrepresentation was a "substantial cause" of his or her

financial loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008). In other words, the plaintiff must plausibly allege that the defendant's fraud was "*revealed* to the market and *caused* the resulting losses." *Id.* at 1063 (emphasis added).

Plaintiff's overarching theory of liability is that Immersion "cooked the books" in response to mounting pressure from investors to become profitable. Specifically, Plaintiff alleges that Immersion systematically recognized medical sales revenue earlier than permitted under GAAP in order to mislead investors into believing that the company was on the cusp of finally achieving sustained profitability. As a result of this practice, Plaintiff contends, Immersion's stock price remained artificially "inflated" throughout the class period.

With regard to loss causation, Plaintiff alleges that Immersion's fraudulent accounting was revealed to the market through a series of "partial disclosures" consisting of (1) disappointing earnings results for 1Q08, 2Q08, 4Q08 and 1Q09; and (2) the subsequent announcement of an internal investigation into prior revenue transactions. The gravamen of Plaintiff's loss causation theory is that Immersion's disappointing financial results signaled that the company lacked the "growth drivers and profitability" that it had previously claimed, and that the subsequent announcement of an investigation into prior revenue transactions confirmed that Immersion had fraudulently overstated its historical

revenues. Most notably for purposes of the instant case, Plaintiff alleges that Immersion's July 1, 2009 announcement of an internal investigation completed the revelation of fraud to the market and removed all inflation from the company's stock price:

> As a direct result of [D]efendants' July 1, 2009 disclosure, Immersion's stock price fell 23% in one day...to close at $3.80 per share[.] This drop resulted in a market capitalization loss of $31.9 million and removed the inflation from Immersion's publicly traded securities, causing real economic loss to investors who had purchased the securities during the Class Period.

## A.

The district court concluded that the allegations regarding Immersion's disappointing financial results were insufficient to establish loss causation as a matter of law. We agree. As the district court correctly recognized, our precedent requires a securities fraud plaintiff to allege that the market "learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." *Metzler*, 540 F.3d at 1063; *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392, 394 (9th Cir. 2010) (holding that an earnings miss, standing alone, is insufficient to establish loss causation; the market must have learned of and reacted to the company's fraudulent *practices* as opposed to the financial impact of those practices). Immersion's disappointing earnings for 1Q08, 2Q08, 4Q08 and 1Q09 are merely indicative of poor financial health; they do not tend to suggest that the company had engaged in fraudulent accounting

practices. At bottom, these disclosures simply reveal that Immersion failed to meet its revenue goals.

Our decision in *Daou* does not dictate a different result. Like Plaintiff, the investors in *Daou* alleged that their losses were caused, at least in part, by the defendant's announcement of "dismal" financial results. 411 F.3d at 1025–26. According to the investors, these disappointing results were the direct result of the defendant systematically recognizing revenue prematurely in violation of GAAP. *Id.* at 1026. The district court dismissed the complaint, ruling that the investors had not adequately linked the disappointing earnings (and the ensuing drop in the defendant's share price) to the alleged accounting fraud. *Id.*

We reversed, holding that the investors had alleged a plausible connection between the disappointing earnings and the alleged fraud. *Id.* at 1026–27. Crucial to our holding was the fact that the defendant's earnings statement revealed more than $10 million in unbilled receivables in a "work in progress" account. *Id.* at 1026. Having previously taken note of allegations that the defendant recognized revenue on contracts for which "little or no labor had yet taken place" (including one anticipated contract that the defendant ultimately lost to a competitor), *id.* at 1019–20, we concluded that $10 million in unbilled revenue was sufficiently suggestive of accounting fraud to survive a motion to dismiss. *Id.* at 1026–27.

Unlike the disappointing earnings disclosure in *Daou*, Immersion's 1Q08, 2Q08, 4Q08 and 1Q09 results do not reveal any information from which revenue accounting fraud might reasonably be inferred. In fact, the only disclosure that might arguably support an inference of fraud is the

company's statement during a 1Q09 earnings call that "payments [were] not taking place on a timely basis from some of [its] overseas customers." But this revelation comes nowhere close to the circumstances presented in *Daou*. For one thing, the missing revenue at issue here had actually been billed to a client. More importantly, however, this statement reveals very little about the reason for the underlying problem. Whereas a "rapidly escalating work in progress account represent[ing] over $10 million in unbilled receivables" supports an inference of premature revenue recognition on a monumental scale, *see id.* at 1026, a single offhand reference to slower than normal collection of accounts receivable does not. Accordingly, we find no error in the district court's analysis of Immersion's 1Q08, 2Q08, 4Q08 and 1Q09 financial results.

## B.

With regard to the July 1, 2009 announcement, the district court ruled that "the announcement of an investigation, standing alone, does not give rise to a viable loss causation allegation." We have never squarely addressed whether the disclosure of an internal investigation can satisfy the loss causation element of a § 10(b) and Rule 10b-5 claim. On one hand, we have stated that a securities fraud plaintiff is not required to allege an outright admission of fraud to survive a motion to dismiss. *See Metzler*, 540 F.3d at 1064 ("[N]either *Daou* nor *Dura* require an admission or finding of fraud before loss causation can be properly pled."). This statement supports Plaintiff's argument that the disclosure of an investigation, which raises the prospect of fraud, is relevant to establishing loss causation. On the other hand, we have stated in the very same breath that a mere "risk" or "potential" for fraud is insufficient to establish loss causation.

*See id.*("[N]either *Daou* nor *Dura* support the notion that loss causation is pled where a defendant's disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct."). This statement supports the district court's conclusion that the mere announcement of an investigation is not enough to establish loss causation.

Our decision in *Metzler*, while relevant, is not particularly instructive here. In that case, the plaintiff's theory of loss causation relied, in part, on a newspaper article which disclosed that the defendant, a nationwide for-profit college, had been investigated and sanctioned by the Department of Education for facilitating financial aid fraud. Although only one of the defendant's eighty-eight campuses had been investigated, the plaintiff argued that the resulting sanctions revealed a "*potential* but real *risk*" that other campuses had engaged in similar misconduct. *Id.* at 1055, 1063 (emphasis in original). We rejected this argument, holding that the sanctions imposed against the single campus were not indicative of fraud on a company-wide scale. *Id.* at 1063–64. We further noted that, in any event, the defendant's stock price made a full recovery within three days of the article being published. *Id.* at 1063–65. Given the limited scope of the investigation at issue in *Metzler*, the most we can say is that the announcement of an investigation can *potentially* be relevant to a securities fraud plaintiff's theory of loss causation.

The Eleventh Circuit has examined the disclosure of a fraud investigation under much more analogous circumstances. In *Meyer v. Greene*, the plaintiff alleged that the defendant, a developer of commercial and industrial real estate, committed fraud by failing to depreciate the value of its real estate holdings in the wake of a significant depression

of the real estate market from 2008 to 2010. 710 F.3d 1189, 1192–93 (11th Cir. 2013). Following a presentation by a prominent stock market analyst suggesting that the defendant's real estate holdings were substantially overvalued, the company's stock price dropped by 20%. *Id.* at 1193. Three months later, the defendant disclosed that the SEC had initiated an informal inquiry into the company's real estate valuation practices. *Id.* The defendant's stock price dropped an additional 7% on this news. *Id.* at 1201. Six months later, the defendant announced that the SEC's inquiry had ripened into a "order of private investigation." *Id.* at 1193. The defendant's stock price dropped another 9% as a result of this disclosure. *Id.* at 1201. The plaintiff attempted to establish loss causation by arguing that the defendant's accounting fraud was revealed to the market through (1) the analyst's presentation; (2) the disclosure of the SEC's informal inquiry; and (3) the announcement of the SEC's private order of investigation. *Id.* at 1197. The Eleventh Circuit rejected this theory. As to the presentation, the court explained that the analyst's information had been derived "entirely from public filings and other publicly available [sources]" of which the stock market was presumed to be aware. *Id.* at 1198. With regard to the SEC investigations, the court reasoned that there had been no "revelation" of a prior false statement to the market:

> In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that—an investigation—and nothing more. To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because

the investigation can be seen to portend an added *risk* of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent.

*Id.* at 1201 (emphasis in original) (internal citations omitted).

We agree with the Eleventh Circuit's reasoning. The announcement of an investigation does not "reveal" fraudulent practices to the market. Indeed, at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal. While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct. Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This type of speculation cannot form the basis of a viable loss causation theory. Accordingly, we hold that the announcement of an investigation, without more, is insufficient to establish loss causation.[3]

---

[3] We do not mean to suggest that the announcement of an investigation can *never* form the basis of a viable loss causation theory. Like the Eleventh Circuit, we merely hold that the announcement of an investigation, "standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure." *Meyer*, 710 F.3d at 1201 n.13 (internal quotation marks omitted). To the extent an announcement contains an express disclosure of actual wrongdoing, the announcement alone might suffice.

Plaintiff attempts to save his loss causation theory by arguing that two post-class period disclosures "solidif[ied] the causative link" between the fraud and his loss.  The crux of this argument is that fears prompted by the July 1, 2009 announcement were later confirmed by (1) an August 10, 2009 disclosure that Immersion's financial statements "should no longer be relied upon"; and (2) the February 8, 2010 restatement itself.  This argument fails for the simple reason that the impact of these events on Immersion's stock price was not alleged in the TAC.**[4]**  Plaintiff's omission of this information is fatal to his ability to plausibly allege loss causation.  We therefore affirm the dismissal of Plaintiff's § 10(b) and Rule 10b-5 claims for failure to state a claim.

## C.

The district court dismissed Plaintiff's amended complaint without leave to amend because Plaintiff failed to correct the deficiencies identified in his original complaint. We find no abuse of discretion in that decision.  The district court gave Plaintiff a detailed explanation of why his original theory of loss causation was deficient.  Despite having this explanation, Plaintiff persisted in attempting to establish loss causation through Immersion's disappointing earnings results and the July 1, 2009 announcement of an internal investigation.  Because Plaintiff "essentially re-pled the same facts and legal theories" in his amended complaint, the district court did not abuse its discretion in dismissing Plaintiff's claims with prejudice. *U.S. Mortg., Inc. v. Saxton*, 494 F.3d 833, 843 n.11 (9th Cir. 2007), *abrogated on other*

---

**[4]** We further note that Plaintiff did not advance this argument in the district court.  The argument is therefore waived.  *In re: Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).

*grounds by Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208 (9th Cir. 2009); *see also Zucco Partners*, 552 F.3d at 1007 ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to [his] claims, the district court's discretion to deny leave to amend is particularly broad.").

## D.

Plaintiff also appeals the dismissal of his claims for failure to plausibly allege scienter under the Private Securities Litigation Reform Act's heightened pleading standards. In view of our holding above, we decline to address Plaintiff's scienter arguments.

## E.

Plaintiff's final contention on appeal is that the district court erred in dismissing his control person and insider trading claims for failure to properly allege an underlying violation of § 10(b) and Rule 10b-5. Because we agree that Plaintiff lacks a viable claim under § 10(b) and Rule 10b-5, we affirm the district court's dismissal of these derivative claims.

**AFFIRMED.**