# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 13-30580

————

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2014

Lyle W. Cayce
Clerk

PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI,
PUERTO RICO TEACHERS' RETIREMENT SYSTEM,

Plaintiffs–Appellants

v.

AMEDISYS, INCORPORATED; WILLIAM F. BORNE; DALE E. REDMAN;
ALICE SCHWARTZ; LARRY GRAHAM; GREGORY H. BROWNE; JOHN F.
GIBLIN; JEFFREY D. JETER,

Defendants–Appellees

_____

DAVID ISMAN,

Plaintiff

v.

AMEDISYS, INCORPORATED; WILLIAM F. BORNE; DALE E. REDMAN,

Defendants-Appellees

_____

ARIK DVINSKY, etc.,

Plaintiff

v.

AMEDISYS, INCORPORATED; WILLIAM. F. BORNE; DALE E. REDMAN;

No. 13-30580JOHN F. GIBLIN; GREGORY H. BROWNE,

JOHN F. GIBLIN; GREGORY H. BROWNE,

Defendants-Appellees

_____

MELVIN W. BRINKLEY,

Plaintiff

v.

AMEDISYS, INCORPORATED; WILLIAM F. BORNE; DALE E. REDMAN,

Defendants-Appellees

_____

Appeal from the United States District Court
for the Middle District of Louisiana

_____

Before STEWART, Chief Judge, and DENNIS, Circuit Judge, and
GILSTRAP, District Judge[1].

JAMES RODNEY GILSTRAP, District Judge:

Plaintiffs–Appellants Public Employees' Retirement System of
Mississippi and Puerto Rico Teachers' Retirement System (collectively,
"PERSM" or "Plaintiffs") are the Lead Plaintiffs and, on behalf of the Class,
filed suit under Sections 10(b) and 20(a) of the Securities Exchange Act of
1934 ("Exchange Act") against Defendants–Appellees Amedisys, Inc.
("Amedisys") and seven current or former board members of Amedisys
including the company's chairman and CEO William Borne, and officers Dale

_____

[1] District Judge for the Eastern District of Texas, sitting by designation.

2

No. 13-30580

E. Redman, Larry Graham, Gregory Browne, John F. Giblin, Alice Ann Schwartz, and Jeffrey Jeter (collectively, "Defendants") claiming that Amedisys defrauded investors by concealing a Medicare fraud scheme. PERSM alleges that despite knowledge or reckless disregard of Amedisys's unlawful billing practices, Defendants issued materially false and misleading public statements to cause Amedisys securities to be traded at materially inflated prices from August 2, 2005 through September 28, 2010 (the relevant "Class Period"). As information concerning such fraudulent practices became known, the value of Amedisys securities dropped precipitously, which caused PERSM and the Class to suffer significant financial loss.

The district court granted a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and dismissed the lawsuit with prejudice. The Plaintiffs then filed a motion for reconsideration of the order granting dismissal and a request for leave to file an amended complaint, which the district court summarily denied. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Amedisys is a publicly traded corporation that provides home health services to patients with chronic health problems. Amedisys is compensated through Medicare's Prospective Payment System (PPS) reimbursements based on the number of in-home visits provided to a given patient within the course of a sixty-day treatment period, called an "episode." Medicare payments represent roughly 90% of the company's reimbursements for services rendered from 2005-2009.

During the first part of the Class Period through December 31, 2007, the Medicare PPS provided a flat fee of approximately $2,200 for treatment of a patient with at least five but fewer than ten therapy visits in an episode. If the number of therapy visits within the episode increased to ten or more,

No. 13-30580

Medicare paid approximately $2,200 more, essentially doubling the amount of reimbursement for services rendered for that patient. Medicare eliminated the ten-visit threshold on January 1, 2008 and revised the PPS to implement thresholds for increased reimbursements upon the occurrence of six, fourteen, and twenty therapy visits during an episode. This 2008 revision remained in effect throughout the remainder of the Class Period.

Under federal law, home health companies are entitled to Medicare reimbursement only for providing medically necessary services. 42 U.S.C.A. § 1395n(a)(2)(A)-(B). PERSM alleges that Defendants committed fraud by pressuring Amedisys employees into providing medically *un*necessary treatment visits to patients in order to hit the most lucrative Medicare reimbursement thresholds. In the course of this fraudulent conduct, the Complaint alleges that Defendants made a series of materially false and misleading statements beginning on August 2, 2005, which artificially inflated the price of Amedisys stock throughout the Class Period.

The Complaint alleges the truth of Amedisys's misrepresentations became publicly known through a series of five partial disclosures. As the truth gradually leaked into the market, the artificial inflation was removed and the value of Amedisys securities significantly declined, causing economic loss to the Lead Plaintiffs and other members of the Class.

The first alleged partial disclosure is an online report published by Citron Research on August 12, 2008 that raised questions about Amedisys's accounting and Medicare billing practices. On the same day, the price of Amedisys's stock dropped 17.86% or $11.80 per share to close at $54.27. During a conference call with various investment firms on October 28, 2008 to discuss its third quarter earnings, Amedisys touted its billing-related compliance programs and reassured investors that "compliance is central to

everything we do as a company . . . Amedisys is a leader in disclosing detailed information."

The second alleged partial disclosure came about with the resignations of Amedisys's President and CEO, Larry Graham, and the Chief Information Officer, Alice Ann Schwartz. This announcement was made on September 3, 2009 in a press release stating that the two executives were leaving "to pursue other interests." On that day, Amedisys's stock dropped 21.68% or $9.42 per share to close at $34.04.

The third alleged partial disclosure is an article published by the Wall Street Journal (WSJ) on April 26, 2010, reporting on Amedisys and including a detailed analysis of Medicare data indicating that the company might be "taking advantage of the Medicare reimbursement system." The WSJ enlisted Henry Dove, a Yale professor, to analyze Medicare records to determine how often between 2005 and 2008 various home health companies sent therapists to patients' homes during a 60 day treatment period and whether such visits coincided with Medicare financial incentives. Professor Dove's results revealed a questionable pattern of home visits clustered around reimbursement targets. After the 2008 change in Medicare's PPS threshold, the percentage of Amedisys patients getting 10 visits (the prior threshold) dropped by 50% while the percentage that got 14 visits (a new threshold) rose 33%, and the percentage getting 20 visits (another new threshold) increased 41%. Additionally, the article quoted a former Amedisys nurse as saying that "I was told 'we have ten visits to get paid,'" and "[t]he tenth visit was not always medically necessary." Within the WSJ Article was a statement from an Amedisys spokesperson, Kevin LeBlanc, declaring any suggestion that the company may have increased its number of therapy visits to receive higher reimbursements is "both incendiary and inaccurate." The next day, Amedisys's stock dropped 6.58% or $3.98 per share to close at $56.52.

The fourth alleged partial disclosure is a combination of three government investigations into Amedisys's billing practices that commenced during the remainder of the Class Period. On May 12, 2010, the WSJ reported that the Senate Finance Committee (SFC) had launched an investigation to determine whether Amedisys deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements. Senator Charles Grassley was quoted as saying: "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both. We're working to figure out what's going on." The next day, Amedisys issued a public statement attempting to downplay the importance of the SFC investigation and to otherwise reassure its investors: "The letter of inquiry received from Senators Grassley and Baucus references an article published recently in The Wall Street Journal. The article told an incomplete story about the value of home health to patients, their families, and the overall healthcare system." Despite these reassurances, however, the company's stock dropped 7.97% or $4.48 per share to close at $51.73. Next, on June 30, 2010, Amedisys issued a press release announcing that it had received a notice of formal investigation from the Securities and Exchange Commission (SEC) and a subpoena for documents. On July 1, 2010, Amedisys's stock dropped 10.55% or $4.64 per share to close at $39.34. Finally, on September 28, 2010, Amedisys issued yet another press release disclosing that it had received a civil investigative demand from the Department of Justice (DOJ) pursuant to the False Claims Act, which sought a wide range of documents relating to its "clinical and business operations, including reimbursement and billing claims submitted to Medicare." That day, Amedisys's stock dropped 15.51% or $4.41 per share to close at $24.02.

The fifth and final alleged partial disclosure occurred between the commencement of the SEC and DOJ investigations. On July 12, 2010,

No. 13-30580

Amedisys announced disappointing second quarter operating results to its shareholders. As a result, its stock price declined 24.13% or $8.45 per share to close at $26.57 the next day. During an earnings call on July 13, the company's chairman and CEO, William Borne, stated that "the decline in our volume of recertifications more than offset our growth in admissions for this quarter . . . We are very disappointed with these results."

Following the poor second quarter operating results, various Amedisys officers attributed the decline in the recertification rates to "distractions" or "external factors" relating to the investigations, as well as "behavioral" changes of the clinicians not seeking recertifications. In fact, Amedisys admitted in the Form 10-Q that its "internal episodic-based recertification growth has decreased from 10% in the second quarter of 2009 to a negative 9% for the second quarter of 2010." The decline in recertifications continued through the third quarter of 2010, with Amedisys reporting: "We have continued to experience a decline in the number of recertifications over 2009 and expect the trend to continue into the fourth quarter."

In sum, Amedisys's stock price declined from $66.07 per share on August 11, 2008 (prior to the Citron report) to $24.02 per share on September 28, 2010. A series of class action lawsuits were filed against the Defendants in June and July of 2010. The suits were consolidated and PERSM was designated the Lead Plaintiff in October 2010. Defendants filed a motion to dismiss under Federal Rule of Civil Procedure (FRCP) 12(b)(6), which was granted by the district court. The district court held that PERSM failed to adequately plead loss causation, an essential element of their claims under Section 10(b) of the Exchange Act. In granting dismissal, the district court reviewed each of the above five partial disclosures and found that none alone was sufficient to constitute a corrective disclosure for purposes of pleading

7

loss causation. The Complaint was dismissed with prejudice on June 28, 2012.

After the case was dismissed, PERSM sought reconsideration of the order granting the motion to dismiss and also moved for leave to file a first amended complaint. The district court denied reconsideration and leave to amend citing the reasons provided in its original ruling.

PERSM timely appealed the district court's decision granting the motion to dismiss. PERSM also appeals the denial of its motion for reconsideration and for leave to file an amended complaint, as well as the dismissal of this action with prejudice.

## II.    JURISDICTION

Appellants seek review of a final judgment of the district court. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## III.    STANDARD OF REVIEW

We review the district court's grant of a motion to dismiss under FRCP 12(b)(6) de novo, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013) (citing *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks and citation omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.  DISCUSSION

We address the district court's grant of the motion to dismiss for failure to plead loss causation.

### A. The District Court's Ruling On Failure To Plead Loss Causation

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements are "(1) a material misrepresentation (or omission), (2) scienter, *i.e.*, a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' (5) economic loss, and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009) (citing *Dura Pharmaceuticals, Inc., et al. v. Broudo, et al.*, 544 U.S. 336, 341–42 (2005)).

The Supreme Court in *Dura* and *Twombly* identified the basic principles of pleading loss causation under FRCP 8(a)(2) as setting forth a standard of "plausibility," or something beyond the mere possibility of loss causation. *Twombly*, at 557–58; *Dura*, 544 U.S. at 346 (stating that the plaintiff need only adequately allege and prove the traditional elements of causation and loss for recovery in private securities fraud actions). For a complaint to adequately plead this requirement, it need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura*, 544 U.S. at 346 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The loss causation element, as codified in the Private Securities Litigation Reform Act (PSLRA), provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover

9

damages." 15 U.S.C. § 78u-4(b)(4). Accordingly, the issue before us is whether the Plaintiffs adequately alleged that the Defendants' misrepresentations (or omissions) proximately caused the Plaintiffs' economic loss.

To establish proximate causation, the plaintiff must allege that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm. *Lormand*, 565 F.3d at 255 (citing *Dura* 544 U.S. at 342). Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is *more probable than not* that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop." *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1311–12 (11th Cir. 2011) (emphasis added).

PERSM alleged in its Complaint that it suffered economic loss from declines in Amedisys's stock price in response to a series of five partial disclosures gradually exposing the nature of Amedisys's business practices and the extent of the risks associated with such practices. The district court evaluated each of the five alleged partial disclosures and concluded that none of them amounted to a corrective disclosure for purposes of pleading loss causation. We first discuss what constitutes a corrective disclosure. Then, we will consider each of the alleged partial disclosures in turn.

No. 13-30580

1. Corrective Disclosures

There is little precedent directly addressing to what extent fraud must become known by the market before it can constitute a corrective disclosure—or revelation of the pertinent truth—for purposes of pleading loss causation in a private securities action. There is, however, case law on the sufficiency of pleading proximate causation that is instructive to our analysis.

The Supreme Court in *Dura* set forth the controlling standard for pleading proximate causation in a private securities fraud-on-the-market case: "[O]rdinary pleading rules are not meant to impose a great burden upon a plaintiff. But it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." 544 U.S. at 347 (holding that an inflated purchase price alone cannot satisfy the proximate causation element). Relying on *Dura*, this Circuit explained in *Lormand* that to establish proximate causation, the plaintiff must prove that when the "relevant truth" about the fraud began to leak out, it caused the price of stock to depreciate and thereby proximately cause the plaintiff's economic loss. 565 F.3d at 255. Thus, the plaintiffs are required to allege the truth that emerged was "related to" or "relevant to" the defendants' fraud and earlier misstatements.[2] The answer, therefore, turns on the meaning of "relevance."

This Circuit has previously observed that the standard of "relevance" in an evidentiary context is not a steep or difficult one to satisfy. *Lormand*, 565 F.3d at 256 n.20. The test for "relevant truth" simply means that the truth disclosed must make the existence of the actionable fraud more probable than

---

[2] *Lormand* refers to *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657, 666 (5th Cir. 2004), a case involving proof of loss causation at the summary judgment stage holding that a plaintiff must *prove* on the merits that the negative "truthful" information causing the decrease in price is *related* to an alleged earlier misrepresentation. 565 F.3d at 256. The evidentiary burden at the initial pleadings stage is much less stringent.

it would be without that alleged fact, taken as true. *Id.*; *see also Spitzberg v. Houston American Energy Corp.*, --- F.3d ---, No. 13-20519, 2014 WL 3442515 at \*8 (5th Cir. Jul. 15, 2014) (concurring with *Lormand* on the applicable standard for pleading corrective disclosure). We agree with the *Lormand* and *Spitzberg* Courts and find this test to be the appropriate standard to measure corrective disclosures as they pertain to the adequacy of alleging loss causation at the initial pleadings stage.

This test for "relevant truth" is consistent with similar opinions of our sister courts. *See In re Williams Sec. Litig.—WCC Subclass.*, 558 F.3d 1130, 1140 (10th Cir. 2009) (finding that to be corrective, a disclosure need only relate back rather than precisely mirror the earlier misrepresentation); *FindWhat*, 658 F.3d at 1311–12 (11th Cir. 2011) (holding that a "corrective disclosure" can be demonstrated circumstantially); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266–67 (S.D. Cal. 2010) ("A 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market."). A corrective disclosure can come from any source, and can "take any form from which the market can absorb [the information] and react," Matthew L. Fry, Pleading and Proving Loss Causation in Fraud–on–the–Market–Based Securities Suits Post–*Dura Pharmaceuticals*, 36 Sec. Reg. L.J. 31, 64–71 (2008), so long as it "reveal[s] to the market the falsity" of the prior misstatements. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n. 4 (2d Cir. 2005).

Nor does the corrective disclosure have to be a single disclosure; rather, the truth can be gradually perceived in the marketplace through a series of partial disclosures. *Lormand*, 565 F.3d at 261. "Thus besides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud from a number of sources: *e.g.*, from whistleblowers, analysts' questioning financial results, resignations of

No. 13-30580

CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2005 WL 3504860 at *16 (S.D. Tex. 2005) (citations omitted).

2. The Five Partial Disclosures

We now review each of the five partial disclosures plead in the Complaint against the test for "relevant truth," but we consider them collectively in determining whether a corrective disclosure has occurred.

a. *2008 Citron Report*

The Citron Report is admittedly inconclusive, ending with a statement that "it is not yet concluding that Amedisys is committing Medicare fraud, but there are many indications that this inquiry needs deeper scrutiny." Speculation of wrongdoing cannot by itself arise to a corrective disclosure. Providing investors with what is in effect insurance against market losses due to media speculation is outside the purview of federal securities laws. While the information disclosed in the 2008 Citron Report does not alone make the existence of the actionable fraud more probable than not, it must be considered within the totality of all such partial disclosures.

b. *Schwartz and Graham Resignations*

We concur with the district court that the announcement of the resignations of Amedisys's Chief Operating Officer, Larry Graham, and Chief Information Officer, Alice Ann Schwartz "to pursue other interests" also does not in and of itself constitute a corrective disclosure. The market's decline of 21.68% following the announcement, while not insignificant, could have simply been a market reaction to sudden news that two key executives had left the company. While nothing in the resignation announcement alone reveals the truth behind earlier misstatements or provides notice to the Defendants of what the causal connection might be between the relevant

economic loss and the misrepresentations regarding compliance with Medicare billing practices, this too may constitute a portion of the totality that we must consider. *See Williams*, 558 F.3d at 1140 (stating that the leaked truth must relate back to the earlier misrepresentation rather than come from some other plausibly depressive information about the company).

### c. *April 26, 2010 WSJ Article*

The district court found that the WSJ Article does not, as a matter of law, constitute a corrective disclosure because the article proclaims on its face that its analysis was "based on publicly available Medicare records," and as such, does not reveal any new information to the marketplace. While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace. Under a Rule 12(b)(6) analysis, it is plausible that, as the Appellants allege, the efficient market was not aware of the hidden meaning of the Medicare data that required expert analysis, especially where the data itself is only available to a narrow segment of the public and not the public at large. Thus, although a disclosure of mere confirmatory information will not cause a change in the stock price because the current price already reflects the information available, we find it plausible that this information was not merely confirmatory.

Appellant's point that various independent analysts have characterized the WSJ Article as "new news" also plausibly counters the argument that the sources used in the article have previously been made public. At the pleading stage, this Court does not find the WSJ Article should be justifiably pushed aside simply because the data it was based upon may have been technically

14

available to the public, given that the raw data itself had little to no probative value in its native state. [3]

### d. Investigations Initiated by the SFC, SEC, DOJ, and Amedisys's Disappointing Second Quarter 2010 Earnings Report

As an initial matter, Defendants assert that Plaintiffs' argument concerning the 2010 second quarter earnings report as a corrective disclosure was waived by Plaintiffs' failure to adequately brief it. Defendants' argument has some force; nonetheless, notice exists despite the marginal briefing. We hold that the argument was not waived and we consider it in our analysis.

We agree with the district court that generally, commencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure. *Meyer v. Greene*, 710 F.3d 1189, 1200–01 (11th Cir. 2013) (holding that the commencement of an SEC investigation was not a corrective disclosure because the SEC never issued any finding of wrongdoing); *Loos v. Immersion Corp.*, --- F.3d ---, No. 12-15100, 2014 WL 3866084 (9th Cir. Aug. 7, 2014) (holding that a press release announcing an internal investigation, without more, is insufficient to establish loss causation); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 909-10 (W.D. Tex. 2008) (holding that the disclosure of an SEC investigation absent a revelation of prior misrepresentation does not constitute a corrective disclosure). However, the investigations launched by the SFC (on May 12, 2010), the SEC (on June 30, 2010), and the DOJ (on September 28, 2010) into Amedisys's suspected gaming of the Medicare reimbursement system must be viewed together with the totality of the other alleged partial disclosures.

---

[3] Appellants use the Declaration of Rena Conti, Ph. D. (originally attached to the motion for reconsideration) to show that the Medicare data used by Professor Dove was difficult to obtain and that his analysis required significant professional expertise to accomplish.

No. 13-30580

Plaintiffs' allegations began with media speculation into a possibility of Medicare fraud and calling for deeper scrutiny into Amedisys's practices. Then, two executives departed the company and the WSJ published a front-page article on the questionable statistical correlation between Amedisys's in-home health visits and Medicare's financial incentives. Shortly thereafter, both the SEC and SFC initiated investigations into Amedisys's billing practices, in response to the media's call for scrutiny. Amedisys announced its disappointing second quarter 2010 operating results and Amedisys's stock price plummeted 24.13%. Amedisys executives explained the poor performance was due to a decline in the volume of patient recertifications that they attribute to "behavioral" responses from their clinicians in light of the pending governmental investigations. On September 28, 2010, Amedisys's stock price dropped again by 15.51% when the DOJ investigation was announced. Between the 2008 Citron Report and commencement of the DOJ investigation, Amedisys stock declined a statistically significant 63.6%.

According to the Complaint, Defendants made materially false and misleading statements about their compliance to artificially inflate the price of Amedisys securities throughout the Class Period. Once Amedisys was placed under the spotlight of government scrutiny for Medicare fraud, its earnings dropped significantly because its employees could no longer continue exploiting Medicare reimbursements. After each negative partial disclosure, Defendants attempted to mitigate the impact of those disclosures by making contemporaneous misstatements to the market and prevented the full truth from being revealed at once. As a result, PERSM and the other Class members purchased Amedisys securities at artificially inflated prices and suffered economic loss when the artificial inflation dissipated and the price of these securities declined in response to the series of partial disclosures revealing the true nature of Amedisys's business practices.

No. 13-30580

Taking the above facts as true, the 2008 Citron Report, the Swartz and Graham resignations, the 2010 WSJ Article and the above governmental investigations, coupled with Amedisys's second quarter 2010 earnings report, collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation for purposes of a Rule 12(b)(6) analysis. This holding can best be understood by simply observing that the whole is greater than the sum of its parts. The district court erred in imposing an overly rigid rule that government investigations can never constitute a corrective disclosure in the absence of a discovery of actual fraud.[4] [5] "To require, in all circumstances, a conclusive government finding of fraud merely to plead loss causation would effectively reward defendants who are able to successfully conceal their fraudulent activities by shielding them from civil suit." *In re Questcor Sec. Litig.*, No. SA CV 12-01623 2013 WL 5486762 at *22 (C.D. Cal.

---

[4] The district court relies on *In re Almost Family* in much of its evaluation of the partial disclosures. 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) (holding that the April 26, 2010 WSJ Article and commencement of the SFC and SEC investigations do not constitute corrective disclosures because neither event made a specific allegation of fraud or disclosed any actual misconduct). However, of the four publicly traded home health companies under investigation by the SFC, Almost Family alone was effectively exonerated by the Senate Report released on October 3, 2011. Therefore, *Almost Family* is distinguishable from this case as well as two related cases involving the companies found to be abusing the Medicare system, LHC Group and Gentiva. *See City of Omaha Police and Fire Retirement Sys. v. LHC Group, Inc., et al.*, No. 6:12-1609, 2013 WL 1100819 (W.D. La. Mar. 15, 2013) (holding that the amended complaint adequately alleged the investigations by the SFC and SEC as corrective disclosures and properly pled loss causation); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388 (E.D.N.Y. Mar. 25, 2013) (holding that an announcement of a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial corrective disclosure for purposes of loss causation).

[5] During oral argument, Amedisys agreed that "actual fraud" is not the only standard to evaluate a corrective disclosure; rather, Amedisys argued that a corrective disclosure could also reveal the falsity in a prior statement. Semantics aside, we think there is little difference between a showing of "actual fraud" and "actual falsity" for purposes of pleading loss causation in a fraud-on-the-market case. Requiring allegations that establish prior statements of compliance to be actually false is tantamount to a pleading threshold of actual fraud by showing a failure to comply. Such a standard is inconsistent with our prior precedent, including *Lormand*.

Oct. 1, 2013). Indeed, "there is no requirement that a corrective disclosure take a particular form or be of a particular quality . . . It is the exposure of the fraudulent representation that is the critical component of loss causation." *In re Bristol Meyers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) (citations and internal quotation marks omitted). Accordingly, when this series of events is viewed together and within the context of Amedisys's poor second quarter 2010 earnings, it is plausible that the market, which was once unaware of Amedisys's alleged Medicare fraud, had become aware of the fraud and incorporated that information into the price of Amedisys's stock.[6]

A motion to dismiss challenges the adequacy of the initial pleading. To plead loss causation in a private securities action, the complaint need only allege facts that support an inference that the Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud. *Lentell*, 396 F.3d at 175. Whether the connection between Amedisys's misleading statements and the alleged corrective disclosures may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this

---

[6] The SFC Report released on October 3, 2011 concluded that three of the four companies under investigation have been taking advantage of the Medicare regulations: "Amedisys, LHC Group, and Gentiva encouraged therapists to target the most profitable number of therapy visits, even when patient need alone may not have justified such patterns." Additionally, the Senate Report focused its efforts on Amedisys, stating that "the home health therapy practices identified at Amedisys . . . at best represent *abuses* of the Medicare home health program. At worst, they may be examples of [Amedisys] *defrauding* the Medicare home health program at the expense of taxpayers."

Appellants also mention for the first time in their Reply Brief that Amedisys has settled the civil investigation with the DOJ on November 12, 2013 for $150 million. Amedisys has also settled related derivative and ERISA claims that were consolidated as part of this action. This evidence was not before the district court and could not have been considered when the order of dismissal was entered.

point. The Complaint consists of over 200 pages of allegations regarding, among other things, Defendants' fraudulent Medicare billing practices. Where the Complaint sets forth specific allegations of a series of partial corrective disclosures, joined with the subsequent fall in Amedisys stock value, and in the absence of any other contravening negative event, the plaintiffs have complied with *Dura*'s analysis of loss causation. *See also Spitzberg*, 2014 WL 3442515 at *9 (holding that the plaintiffs sufficiently pled loss causation based on the drop in stock price that occurred after the corrective disclosure).

Accordingly, a de novo review of the Complaint leads us to conclude that as to the element of loss causation, the motion to dismiss should be denied. The district court's application of the "actual fraud" standard to the partial disclosures discussed above and when viewed against the stark results of Amedisys's second quarter of 2010 earnings report requires reversal and vacating the prior dismissal with this case remanded so that the district court can reevaluate these events in light of our holdings.[7]

## B.  Leave To File An Amended Complaint

Given our determination that the district court's dismissal must be vacated and the case remanded, we do not reach the issue of whether the district court abused its discretion in denying PERSM leave to file an amended complaint once judgment was entered. Such must now be viewed as moot in light of our holding herein.

## V.   CONCLUSION

For the foregoing reasons, we REVERSE and VACATE the district court's grant of the motion to dismiss and REMAND this matter for further proceedings consistent with this opinion.

---

[7] We do not reach in the first instance the Defendants' argument that the Complaint failed to plead scienter with sufficient particularity.