**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| BARRY R. LLOYD, *Plaintiff*, and JACKSONVILLE POLICE AND FIRE PENSION FUND, *Plaintiff-Appellant*, v. CVB FINANCIAL CORPORATION; CHRISTOPHER D. MYERS; EDWARD J. BIEBRICH, JR., *Defendants-Appellees*. | No. 13-56838 D.C. No. 2:10-cv-06256-MMM-PJW OPINION |

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
December 10, 2015—Pasadena, California

Filed February 1, 2016

Before: Harry Pregerson, Consuelo M. Callahan,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

## SUMMARY[*]

### Securities Fraud

The panel affirmed in part and reversed in part the district court's dismissal of a putative class action under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, alleging misrepresentations in defendant's filings with the Securities and Exchange Commission.

The panel held that the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation.  Accordingly, the second amended complaint stated a claim as to two alleged misrepresentations.

Affirming as to other alleged misrepresentations, the panel held that vague, optimistic statements were correctly characterized as puffery and were not actionable.  In context, there was nothing misleading about statements regarding the Southern California real estate market.  In addition, the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

second amended complaint did not allege facts raising a strong inference of scienter as to statements regarding defendant's accounting practices.

The panel affirmed the dismissal of claims based on an SEC filing of November 2009.  It reversed, however, as to SEC filings of March and May, 2010.  The panel held that the second amended complaint sufficiently alleged falsity and scienter as to statements in these SEC filings. Answering a question left open in *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), and agreeing with the Fifth Circuit, the panel held that the complaint also sufficiently alleged loss causation because the announcement of an investigation can form the basis for a viable loss causation theory if the complaint also alleges a subsequent corrective disclosure by the defendant.

## COUNSEL

Timothy A. DeLange (argued), Niki L. Mendoza, Bernstein Litowitz Berger & Grossmann LLP, San Diego, California, for Plaintiff-Appellant.

George T. Conway, III (argued), David M. Murphy, Warren R. Stern, Wachtell, Lipton, Rosen & Katz, New York, New York; Scott Vick, Jason T. Riddick, Rachelle S. Torres, Vick Law Group, APC, Los Angeles, California, for Defendants-Appellees.

**OPINION**

HURWITZ, Circuit Judge:

The last recession put the Garrett Group, a commercial real estate company, into serious financial trouble. In 2008, Garrett informed its largest creditor, CVB Financial Corporation ("CVB"), that it could not make payments on its loans. After the loans were restructured, Garrett informed CVB in early 2010 that it again could not make the required payments and was contemplating bankruptcy.

CVB nonetheless represented in 2009 and 2010 filings with the Securities and Exchange Commission ("SEC") that there was no basis for "serious doubt" about Garrett's ability to repay its borrowings. In 2010, the SEC served a subpoena on CVB, seeking information about its loan underwriting methodology and allowance for credit losses. The day after CVB announced receipt of the subpoena, its stock dropped 22%, and analysts noted the probable relationship between the subpoena and CVB's loans to Garrett, its largest borrower. A month later, CVB wrote down $34 million in loans to Garrett and placed the remaining $48 million in its non-performing category.

In this putative class action, Jacksonville Police & Fire Pension Fund ("Jacksonville") alleges violations of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The district court granted CVB's motion to dismiss, holding that the Second Amended Complaint ("SAC") failed to plausibly allege that any of the statements by CVB challenged in the pleading were either knowingly or recklessly false or caused a loss to shareholders.

We affirm in part and reverse in part, finding that the SAC stated a claim as to two alleged misrepresentations. In doing so, we hold that the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation. *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014) (reserving this question).

## I.  Background[1]

### A. The September 2008 Meeting and Subsequent Loans

In late August or early September 2008, Garrett's Board of Advisors, including its Chief Operating Officer ("COO"), met to discuss an upcoming meeting with CVB.  According to the COO, whom the SAC does not otherwise identify, the Board was told that management planned to inform CVB that Garrett had laid off twenty people, reduced salaries, and could not make payments on its loans.  At the time, Garrett was CVB's largest borrower.

CVB officials and Garrett executives Paul Garrett and Kirk Wright, Garrett's Chief Executive Officer, met about two weeks later, in the fall of 2008.  Two weeks after that meeting, Wright confirmed to the Board that CVB had been informed of the layoffs and salary reductions and told that Garrett could not meet its current obligations, including its loan payments to CVB.

---

[1] Because this is an appeal from an order dismissing the SAC for failure to state a claim, we take the well-pleaded allegations in the SAC as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

CVB subsequently made an additional $10 million loan to Garrett, secured by an interest in rent in fifteen properties. When the new loan closed, Garrett was ninety days delinquent on its loan payments to CVB. Garrett used a quarter of the new loan to get current with CVB. Garrett's COO recalled that "CVB was trying to keep the house of cards standing." Other Garrett employees confirmed that Garrett's financial situation in 2008 and early 2009 was "rotten," with rental properties vacant for years, and that Garrett had considered bankruptcy.

In March 2009, CVB provided Garrett with $53 million in refinancing. CVB also made other modifications to Garrett loans in 2009.

## B.  The November 2009 Representations

On November 5, 2009, CVB issued a quarterly report, known as a Form 10-Q, for the period ending September 30, 2009. The 10-Q listed troubled loans and then stated that CVB was "not aware of any other loans as of September 30, 2009 for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their loan repayment terms, or any known events that would result in the loan being designated as non-performing at some future date." The loans to Garrett were not listed.

## C.  The January 2010 Meeting

By the end of 2009, Garrett again became delinquent with CVB. According to Garrett's COO, in late December 2009 or early January 2010, Wright told his Board that Garrett needed to meet with CVB to address this situation.

The meeting with CVB occurred one week later, in early January 2010.  A week after that, Wright reported back to the Garrett Board.  Wright reported that Garrett told CVB it would file for bankruptcy unless the loans were modified.  Garrett also discussed two other options with CVB: selling assets or bringing on a new equity partner.  It also provided CVB with the financial projections and presentation it had used in unsuccessful attempts to woo new investors.  Wright told the Board that Garrett had pleaded with CVB for more time to resolve the loan situation, but that no agreement had been reached.

CVB and Garrett continued negotiations about the loans throughout 2010.  Garrett never again became current on its obligations to CVB.

### D.  The March and May 2010 Representations

On March 4, 2010, CVB filed a Form 10-K for calendar year 2009.  The 10-K stated that CVB was "not aware of any other loans as of December 31, 2009 for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their loan repayment terms."  As with the previous 10-Q, this statement appeared after a list of non-performing or past-due loans.  That list did not include the Garrett loans.

CVB made a nearly identical "no serious doubts" statement in a 10-Q filed on May 10, 2010.  That statement differed from the previous "no serious doubts" statements only in that it was "as of March 10, 2010."

### E.  The Alleged Disclosures

In May and June 2010, an anonymous blogger suggested that CVB was engaging in a "cycle of extend and pretend"

with its loans to Garrett and others, often restructuring the loans at the end of the quarter or year, before FDIC audits. But, other analysts did not credit these blog posts, and neither did the market at large; CVB's stock price rose, climbing to $10.61 on July 26, 2010.

On July 26, 2010, CVB received a subpoena from the SEC. On August 9, 2010, after the stock market closed, CVB filed a form 10-Q for the second quarter of 2010, which disclosed receipt of the subpoena, stating:

> The subpoena requests information regarding our loan underwriting guidelines, our allowance for credit losses and our allowance for loan loss calculation methodology, our methodology for grading loans and the process for making provisions for loan losses, and our provision for credit losses. In addition, the subpoena requests information regarding presentations we have given or conferences we have attended with analysts, brokers, investors or prospective investors.

The next day, CVB's stock fell 22%, from $10.30 to $8.00 per share, a loss of $245 million in market capitalization.

Several analysts commented on the subpoena. The blogger claimed that it "appear[s] to validate our overall concerns with the bank." Dow Jones specifically noted a connection to the Garrett loans:

> Discussion of CVB Financial centers on its largest exposure, loans to a property company called the Garrett Group. Skeptics believe this exposure is backed by collateral whose market value is well below that of the

loan amount. Some also question whether CVB extended a new loan to Garrett to help it pay existing loans, something Myers denies. He said the Garrett Group was current on its loans at the end of the second quarter, but the bank had reserves against the exposure.

Credit Suisse observed that the investigation appeared to pertain to the adequacy of CVB's reserves, including those for its largest borrower, Garrett, and the adequacy of CVB's disclosures. And, on August 11, FIG Partners wrote:

It appears the SEC is looking into whether CVB[] misled the Street by hiding the true performance of loans the company said were performing. In doing so, the SEC is also implying that company management hid the true nature of the loan portfolio from the FDIC and California Department of Financial Institutions (the bank's primary regulators).

. . .

The information sought [in the SEC subpoena] is very similar to stories in the press recently that the company was overstating credit quality.

A month later, after the market closed on September 9, CVB announced that Garrett was unable to pay its loans as scheduled; the bank charged off $34 million in Garrett loans and characterized the remaining $48 million as non-performing and impaired. CVB announced that it had $24.7 million in reserves for credit losses and was recording an additional $9.3 million to account for the $34 million charge-off. CVB also announced that it had only an equity interest,

and no direct liens, on the fifteen properties that served as collateral for the largest loan to Garrett, which had a balance of $42.5 million, and that it was discounting the value of its UCC-1 filings on those properties to zero.

The next day, Credit Suisse published an analysis of CVB's announcement:

> More importantly, in our view, CVB[] announced that it was placing its largest (and most controversial) loan on non-performing status, and writing it down to its recent appraisal (less assumed OREO costs).
>
> While the SEC subpoena remains outstanding, we believe the announcement removes a major component of uncertainty in regards to problem loans; for which the subpoena also seeks to address (to a certain extent).

Consistent with that analysis, CVB's stock dropped only slightly on September 10, from $7.05 to a closing price of $6.99. By the next week the stock had risen above $7.05, and it never again fell below that price. As another analyst wrote on September 13, 2010:

> The company's share price plummeted by ~22% to $8.00 on August 10, which was the day after it disclosed the SEC investigation. Since then, the share price has drifted down by an additional ~13% to $6.99 on September 10. There was only a modest decline of ~1% following the earnings preannouncement as further deterioration in credit quality and uncertainty surrounding the SEC

investigation are already reflected in the share price.

In January and February 2011, CVB recorded Notices of Default on $58 million of Garrett loans. Despite the 2010 SEC subpoena, no formal agency proceedings were instituted against CVB.

## F.  Procedural History

In 2010, two securities fraud actions were filed against CVB in the United States District Court for the Central District of California. The district court consolidated the suits and appointed Jacksonville as lead plaintiff. The court then dismissed in turn, each time with leave to amend, the consolidated complaint, a First Amended Complaint, and the SAC. Jacksonville declined to further amend its complaint and requested that the district court enter judgment. The court did so, and Jacksonville timely appealed.

## II.  Standard of Review

We review a dismissal for failure to state a claim *de novo*, accepting all well-pleaded allegations as true. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Securities fraud claims must satisfy the "exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emp. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).

## III. Discussion

The SAC alleged that CVB, Myers, and CVB's former Chief Financial Officer, Edward Biebrich (collectively, "CVB") violated Section 10(b) of the Securities and

Exchange Act of 1934 and Rule 10b-5.**[2]** The elements of a private securities fraud action under Section 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (citation omitted).

The complaint must plead specific facts indicating why any alleged misrepresentation was false or any omission rendered a representation misleading. 15 U.S.C. § 78u–4(b)(1); *Metzler*, 530 F.3d at 1070. To plead scienter adequately, the complaint must "state with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u–4(b)(2)(A), that "defendants engaged in knowing or intentional conduct," which includes "deliberate recklessness," *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (internal citation and quotation marks omitted). The inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The SAC alleges four general categories of false and misleading statements:

---

**[2]** The SAC also alleged that Myers and Biebrich violated Section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a), as controlling employees of CVB. The parties correctly agree that, in the context of this appeal from an order granting a motion to dismiss, the control person liability claim rises or falls with the primary violation claim. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

1. CVB's touting of its loan underwriting culture, credit metrics, and the quality of its loan portfolio.

2. CVB's statement that the deteriorating real estate market "could" harm its borrowers' ability to repay.

3. CVB's financial statements, which allegedly violated Generally Accepted Accounting Principles ("GAAP").

4. CVB's assurance in its SEC filings that it was "not aware of any other loans . . . for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their loan repayment terms."[3]

We analyze these alleged misrepresentations to determine whether the SAC includes detailed allegations compelling the inference that each statement was false and made with the requisite scienter. *See Tellabs*, 551 U.S. at 314; *S. Ferry*, 542 F.3d at 782.

## A. The First Three Categories of Statements

First, the SAC alleges that CVB committed securities fraud by boasting that "[t]he overall credit quality of the loan portfolio is sound"; "CVB's credit metrics are superior" to

---

[3] The SAC also alleges that CVB committed securities fraud by reporting no nonperforming dairy loans throughout the alleged Class Period and then classifying $5.2 million in dairy loans as nonperforming. But, the SAC does not explain why there was not enough time between reporting periods for performing loans later to become non-performing. The allegation therefore fails the heightened pleading standards of the PSLRA and Rule 9(b).

those of its peers; "strong credit culture and underwriting integrity remain paramount at CVB"; and CVB's culture has "limited its exposure to problem credits." The district court dismissed the claims based on these boasts, characterizing them as puffery. That decision was correct. These vague, optimistic statements by CVB officials are not actionable. *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).[4]

Jacksonville next argues that CVB committed securities fraud by describing the Southern California real estate market in several SEC filings simply as a "risk factor" that "could" affect the ability of loan customers to repay "in the future," when in fact that risk had already come to fruition. But, in context, there is nothing misleading about these statements, which were accompanied by information about CVB's credit losses and charge-offs and a warning that "[w]e may be required to make additional provisions for loan losses and charge off additional loans in the future."

Jacksonville also alleges that there were GAAP violations in CVB's published accounting figures. But, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)). To raise

---

[4] Jacksonville also briefly argues that Myers committed securities fraud by boasting that, although ten buildings on CVB's street each had a 75% vacancy rate, CVB had no loans against any of them. The SAC alleges that CVB "did have a loan against a building on the avenue where CVB is headquartered." However, the SAC does not allege that this building was one of the ten Myers identified. Nor does the SAC adequately allege that this boast was material or made with the requisite scienter.

a strong inference of scienter, the SAC must allege facts demonstrating that defendants "knowingly and recklessly engaged in an improper accounting practice," for example, that a company's external auditors counseled against a practice or that a company's CFO was aware that the practice was improper. *Metzler*, 540 F.3d at 1068–69. The SAC contains no such allegations. Nor does it allege the role of the individual defendants in preparing the company's accounting statements or what knowledge they had of GAAP principles. Accordingly, the district court correctly dismissed the GAAP claims.

## B. The SEC Filings

The SAC alleges that, in November 2009, March 2010, and May 2010, CVB's SEC filings falsely assured investors that Garrett had no "known credit problems" that "would cause serious doubts" as to its ability to repay. We examine each filing in turn.

### 1. The November 2009 10-Q

Jacksonville argues that the statement in the 10-Q filed in November 2009— that there was no basis for "serious doubts" about Garrett's ability to pay—was false because, in September 2008, Garrett had expressly told CVB of its financial difficulties. But by November 2009, Garrett had been current on its loans for about a year, and the SAC does not allege that Garrett gave CVB any cause for concern during that year. A meeting a year earlier that led to restructuring does not compel the inference that the November 2009 statement was false.

The SAC also alleges that Garrett personnel continued to be concerned about the company's financial position in 2009. But it does not allege that these concerns were

communicated to CVB.  The SAC also alleges that, in March 2009, CVB restructured $53 million of Garrett loans by providing $44 million in a stand-alone second mortgage and $9 million in a non-purchase-money loan, for which it obtained security interests in at least eleven parcels of property, at least two of which already had tax liens. Additionally, it alleges that CVB provided Garrett with $4 million in refinancing on September 23, 2009.  The fact that CVB gave Garrett additional loans in 2009, even if some later turned out to be unwise, does not show that CVB had a basis for "serious doubts" about Garrett's ability to repay in November 2009; if anything, it points to the contrary.  We therefore affirm the district court's dismissal of Jacksonville's claims based on the November 2009 10-Q.**[5]**

### 2.  The 2009 10-K and the May 10, 2010 10-Q

By late December 2009, Garrett was again delinquent on its loan payments to CVB and had no liquidity to meet its ongoing obligations.  The SAC alleges that Garrett told CVB in early January 2010 that unless modifications to loan terms were made, Garrett could not meet its obligations and might file for bankruptcy.

Assuming that these allegations are true, they would seem to demonstrate that the "no serious doubts" statements

---

**[5]** The SAC also alleges that, at a presentation to analysts on December 2, 2009, Myers falsely stated that Garrett was "a fully performing asset in all respects," that "we don't have specific reserves against that," and "[t]hey are paying everything.  It's performing as agreed."  The only new information that came to light between the November and December statements was the foreclosure on three Garrett properties, none of which were collateral for CVB.  That knowledge would not make false CVB's statements that Garrett was "a fully performing asset" and "paying everything."  We therefore agree with the district court that the SAC failed to state a claim with respect to the December 2009 allegations.

in CVB's 2009 10-Q, filed on March 4, 2010, and in CVB's 10-Q for the first quarter of 2010, filed on May 10, 2010, were false and made with knowledge of, or recklessness towards, their falsity.  The district court discounted these allegations because they involved hearsay, as they were based on what Garrett's COO, whom the SAC does not identify by name, said Wright told the Board about the January 2010 meeting.  But "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009).  Instead, we examine a confidential witness's hearsay report to determine if it is "sufficiently reliable, plausible, or coherent." *Id.*  Here, the statements reported by the COO were specific in time, context, and details, and involved important communications from a chief executive officer to his Board.  They are sufficiently reliable for pleading purposes.

The district court also reasoned that, because the COO was not present at the meeting with CVB, Wright's statements to the Garrett Board cannot capture the precise context of the CVB meeting, leaving open the possibility that Garrett's lament was understood by the lender merely as a negotiating tactic.  The district court found this inference strengthened by Garrett's discussion of alternatives to bankruptcy, and its active pursuit of capital investments.  The court therefore concluded that the most plausible inference was that CVB did not credit Garrett's threat of bankruptcy and believed Garrett would find a way to repay its loans.

The SAC need not allege, however, that CVB actually believed that Garrett was about to go bankrupt, only that CVB was on notice of facts that would reasonably give rise to "serious doubts" about Garrett's ability to repay.  The

SAC adequately alleges that CVB had such notice. In January 2010, Garrett not only told CVB that it could not repay its loans and was considering bankruptcy, but that it had fallen delinquent on its CVB loans and never again became current. Thus, the SAC adequately alleges that before May 10, 2010, CVB had been alerted to facts which "would cause serious doubts" about Garrett's ability to repay.

The SAC also adequately alleges that the "no serious doubts" statement made on March 4, 2010 in CVB's 10-Q was a misrepresentation. That statement assured investors that there was no basis for "serious doubts" about Garrett's loans "as of December 31, 2009." Technically, this may have been true, given that the critical meeting with Garrett did not take place until January 2010. But the statement was plainly misleading when made. By March 2010, CVB had known for two months that there was a basis for serious doubts about the ability of Garrett, CVB's largest borrower, to repay. The omission of that fact, combined with the reassurance that everything was fine as of December 31, 2009, meets the pleading standard for a material omission. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"); *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an

impression of a state of affairs that differs in a material way from the one that actually exists.").

Therefore, we conclude that the SAC sufficiently alleges falsity and scienter as to the "no serious doubts" statements in the 10-K on March 4, 2010, and the 10-Q on May 10, 2010.

## C. Loss Causation

Even when deceptive conduct is properly pleaded, a securities fraud complaint must also adequately plead "loss causation." *Erica P. John Fund*, 131 S. Ct. at 2183. Loss causation is shorthand for the requirement that "investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Id.* Thus, like a plaintiff claiming deceit at common law, the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343–44 (2005). The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through "corrective disclosures" which "caused the company's stock price to drop and investors to lose money." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014).

The district court held that the SAC failed to adequately allege loss causation. The only significant fall in CVB's share price occurred after the August 9, 2010 announcement of the SEC subpoena, and the district court found that the announcement of the subpoena could not constitute a corrective disclosure.

We recently held that "the announcement of an investigation, 'standing alone and without any subsequent

disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'" *Loos*, 762 F.3d at 890 n.3 (quoting *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013)). But in so doing, we left open whether the announcement of an investigation can "form the basis for a viable loss causation theory" if the complaint also alleges a subsequent corrective disclosure by the defendant. *Id.*; *see also Meyer*, 710 F.3d at 1201 n.13 (reserving same question).

We today answer that question in the affirmative. We start from the premise that loss causation is a "context-dependent" inquiry, *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010), as there are an "infinite variety" of ways for a tort to cause a loss, *Assoc'd. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 536 (1983). Because loss causation is simply a variant of proximate cause, *Dura*, 544 U.S. at 343–46, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.

*Loos* made clear that the announcement of a government investigation, without more, cannot meet the loss causation requirement, but much more is alleged here. About a month after it announced the SEC subpoena, CVB disclosed that it was charging off millions in Garrett loans. Although Garrett's stock dropped over 20% the day after the announcement about the subpoena, the market reacted hardly at all to CVB's bombshell disclosure about its largest borrower, confirming that investors understood the SEC announcement as at least a partial disclosure of the inaccuracy of the previous "no serious doubts" statements. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 285 (S.D.N.Y. 2008) (investors' understanding of disclosure is relevant, because "the pertinent inquiry trains

on the most plausible understanding of a given disclosure at the time it was made"). Under the facts of this case, loss causation was sufficiently pleaded. Indeed, any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false.

Our conclusion is consistent with a recent Fifth Circuit decision. In *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, the operative complaint alleged five partial disclosures of the Medicare fraud, including the announcements that the SEC, Department of Justice, and Senate Finance Committee had initiated investigations into the defendant's billing practices. 769 F.3d 313, 317–19 (5th Cir. 2014). The Fifth Circuit reasoned that, "to establish proximate causation, the plaintiff must prove that when the relevant truth about the fraud began to leak out, it caused the price of stock to depreciate and thereby proximately cause the plaintiff's economic loss." *Id.* at 321; *see also In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) ("To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company."). The court held that, even if the announcements of the government investigations were not in themselves enough to establish loss causation, they were sufficient when "viewed together with the totality of the other alleged partial disclosures." *Amedisys*, 769 F.3d at 324.

We similarly conclude that the SAC adequately pleads loss causation. It plausibly alleges that: (1) CVB's disclosure of the subpoena caused its stock price to drop precipitously; (2) the market and various analysts perceived

the subpoena to be related to CVB's alleged misstatements about Garrett's ability to repay; (3) the market's fears about the subpoena were confirmed by CVB's September 9 disclosure that it was writing off $34 million in Garrett loans and categorizing the remainder as non-performing; and (4) the September 9 disclosure's minimal effect on CVB's stock price indicates that the earlier 22% drop reflected, at least in part, the market's concerns about the Garrett loans. Thus, Jacksonville has adequately pleaded "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Whether Jacksonville can establish that causal connection is another question. *See Amedisys*, 769 F.3d at 325.

## CONCLUSION

We vacate the dismissal of the SAC with respect to the "no serious doubts" representations made in the 10-K on March 4, 2010 and the 10-Q on May 10, 2010, and remand for further proceedings consistent with this opinion. The order of the district court is otherwise affirmed.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**